**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| MCImetro ACCESS TRANSMISSION SERVICES LLC, | : : : : | |
| Plaintiff, | : : | Civil Action No. 06-2120 (JAG) |
| v. | : : | **OPINION** |
| NEW JERSEY BOARD OF PUBLIC UTILITIES, an agency of the State of New Jersey, et al., | : : : : : | |
| Defendants, and | : : | |
| UNITED TELEPHONE COMPANY OF NEW JERSEY, INC., | : : : | |
| Intervenor-Defendant. | : : | |

**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on the motion for summary judgment, pursuant to FED. R. CIV. P. 56(c), by Plaintiff MCImetro Access Transmission Services, LLC ("MCI")[1]. For the reasons set forth below, MCI's motion is denied.

### I. FACTUAL AND PROCEDURAL BACKGROUND

#### A. The Interconnection Agreement

MCI is a competitive local exchange carrier ("CLEC") authorized to provide

---

[1] MCI is currently doing business as Verizon Access Transmission Services. (Pl. Statement Undisputed Facts 1.)

telecommunications services in New Jersey. United Telephone of New Jersey, Inc. ("United")[2] is an incumbent local exchange carrier ("ILEC") authorized to provide local exchange services in New Jersey. On July 28, 1997, MCI and United entered into an interim interconnection agreement ("Interconnection Agreement"), which was later filed with and approved by the New Jersey Board of Public Utilities ("BPU"). Among other things, the Interconnection Agreement requires the parties to pay reciprocal compensation for "local traffic," or telecommunications traffic that begins on one party's network and is delivered to – that is, terminated on – the other party's network. Significantly, the Interconnection Agreement does not expressly exclude from its definition of "local calls" any calls made from a modem to an Internet Service Provider, or ISP-bound traffic.

Although the Interconnection Agreement does not specify an expiration date, its language indicates that the parties intended to enter into a final superceding agreement. To date, however, MCI and United have not executed a superceding interconnection agreement for local telephone call traffic in New Jersey.

Section III(A) of the Interconnection Agreement includes a "change-of-law" provision, which states:

> In the event the FCC or the Commission promulgates rules or regulations or issues orders, or a court with appropriate jurisdiction issues orders which conflict with or make unlawful any provision of this Agreement, the Parties shall negotiate promptly and in good faith in order to amend the Agreement to substitute contract provisions which are consistent with such rules, regulations or orders. In the event the Parties cannot agree on an amendment within thirty (30) days from the date any such rules, regulations or orders become effective, then the Parties shall resolve their dispute under the applicable procedures set forth in [Section] XII Default and Dispute

---

[2] United was formerly doing business as Sprint and, as of the date of the filing of this motion, is doing business as Embarq. (Pl. Statement Undisputed Facts ¶ 2.)

Resolution hereof.

(February 2005 Joint Stipulation of Facts Ex. JS-1 at 13.)  Under the Interconnection Agreement's Default and Dispute Resolution provision, the parties consent to negotiate again before submitting the dispute to the BPU:

> The Parties agree that in the event of a default or violation hereunder, or for any dispute arising under this Agreement or related agreements the Parties may have in connection with this Agreement, the Parties shall first confer to discuss in good faith the dispute and seek resolution prior to taking any action before any court or regulator, or before making any public statement about or disclosing the nature of the dispute to any third party.  Such conference shall occur at least at the Vice President level for each Party.  In the case of Sprint, its Vice President for Local Competition, or equivalent officer, shall participate in the meet and confer meeting, and MCIm Vice President, or equivalent officer, shall participate. Thereafter on a non-exclusive basis, the parties agree that any dispute that arises as to the interpretation of any provision of this Agreement or as to the proper implementation of this Agreement may be brought before the Commission for a resolution of the dispute.  However, each party reserves any rights it may have to seek judicial review of any ruling made by the Commission concerning this Agreement or to seek resolution of a dispute before any other federal or state body or tribunal.

(Id. at 17.)

### B. The ISP Remand Order

The Telecommunications Act of 1996 (the "Telecommunications Act" or the "Act") authorizes ILECs and CLECs to negotiate and enter into agreements governing the terms and conditions under which their facilities and networks are interconnected.  The Act provides, with some exceptions, that carriers must establish reciprocal compensation arrangements for the transport and termination of telecommunications, but is silent as to whether reciprocal compensation must be paid for ISP-bound traffic.

The Federal Communications Commission ("FCC") first addressed this open question in 1999, when it issued a declaratory ruling stating that ISP-bound traffic is not local traffic and

3

thus is not subject to the Act's reciprocal compensation requirement. In re Implementation of Local Competition Provisions in Telecomm. Act of 1996, 14 F.C.C.R. 3689, 3703-04 (1999). In 2000, the Court of Appeals for the District of Columbia vacated the FCC's declaratory ruling and remanded the issue back to the FCC. Bell Atl. Tel. Co. v. Fed. Commc'n Comm'n, 206 F.3d 1 (D.C. Cir. 2000). Thereafter, the FCC issued an order ("ISP Remand Order"), effective July 14, 2001, in which it again declared that ISP-bound traffic is not subject to the Act's reciprocal compensation requirement. In re Implementation of Local Competition Provisions in Telecomm. Act of 1996, 16 F.C.C.R. 9151 (2001).[3] Carriers that did not exchange ISP-bound traffic before the effective date of the ISP Remand Order are prohibited from receiving reciprocal compensation for terminating ISP-bound traffic. Id. at 9188-89. If carriers have already agreed to exchange compensation for the termination of ISP-bound traffic, however, the ISP Remand Order provides for the use of a compensation scheme with rate caps that decrease over time. Id. at 9189. The rate caps in the ISP Remand Order's compensation scheme are lower than those listed in the Interconnection Agreement entered into by the parties to the instant action. (Pl. Br. 7.)

The ISP Remand Order also provides:

> The interim compensation regime we establish here applies as carriers re-negotiate expired or expiring interconnection agreements. It does not alter existing contractual obligations, except to the extent that parties are entitled to invoke contractual change-in-law provisions.

Id. at 9189.

---

[3] In WorldCom, Inc. v. Fed. Commc'n Comm'n, the Court of Appeals for the District of Columbia remanded, but did not vacate, the ISP Remand Order. 288 F.3d 429, 434 (D.C. Cir. 2002), cert. denied, 538 U.S. 1012 (2003). To date, the FCC has not issued a superceding ruling.

## C. United Invokes the Change-In-Law Provision

On December 7, 2001, United informed MCI of its offer, pursuant to the Interconnection Agreement, to implement the reciprocal compensation scheme set forth in the ISP Remand Order. Thereafter, MCI and United exchanged a number of correspondences discussing the rate one party may charge the other for terminating ISP-bound traffic. While United sought to implement the rates in the ISP Remand Order, United continued to pay MCI for all local traffic, including ISP-bound traffic, pursuant to the terms of the Interconnection Agreement. The parties were unable to resolve the issue through use of the negotiation process.

On July 10, 2002, United filed with the BPU a Petition for Resolution of Dispute with MCI regarding Reciprocal Compensation. Eleven days later, on July 21, 2002, MCI filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code. In October 2003, MCI and United reached a settlement agreement resolving several outstanding disputes, including the amount of reciprocal compensation owed for ISP-bound traffic in New Jersey through July 21, 2002 (the "Settlement Agreement"). The United States Bankruptcy Court approved this Settlement Agreement on October 14, 2003.

On April 20, 2004, MCI emerged from bankruptcy. To address the unresolved petition filed by United with the BPU, Administrative Law Judge W. Todd Miller issued an Initial Decision on July 21, 2005 recommending that MCI receive reciprocal compensation for ISP-bound traffic at the rate set forth in the Interconnection Agreement for the period beginning July 21, 2002 and ending April 20, 2004, and at the rate set forth in the ISP Remand Order from April 20, 2004 going forward. The BPU ultimately modified Judge Miller's decision, ruling that MCI should receive reciprocal compensation for ISP-bound traffic at the rate set forth in the ISP

Remand Order from July 21, 2002 going forward. MCI requested reconsideration of the decision, but the BPU denied its request on March 22, 2006.

### D. The Instant Motion

On May 8, 2006, MCI filed a three-count Complaint against Defendant BPU. Count One alleges that the BPU's decision is inconsistent with the change-in-law provision in the Interconnection Agreement and violates the terms of the ISP Remand Order. Counts Two and Three allege that the BPU's decision is arbitrary and capricious because it did not change the compensation rates in the Interconnection Agreement on a prospective basis. United filed a motion to intervene as an additional defendant, which this Court granted on January 17, 2007. On February 28, 2007, MCI filed the instant motion requesting that this Court vacate the BPU's decision and remand the matter to the BPU with instructions to approve any amendment to the reciprocal compensation scheme in the Interconnection Agreement effective upon execution of the amendment.

## II. LEGAL STANDARD

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all

justifiable inferences are to be drawn in his favor.'"  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992) (quoting Celotex, 477 U.S. at 322-23).

### III.  ANALYSIS

#### A.  Initial Matters

Before considering the substance of MCI's motion, this Court must first determine the standard to apply when reviewing the BPU's decision. The parties dispute whether this Court should review the BPU's decision under the de novo standard of review or under a more deferential standard of review. MCI argues that this Court should apply the de novo standard of review because the parties have stipulated to all questions of fact before the BPU issued its ruling. However, the BPU and United argue that the BPU's decision rests on its interpretation of the Interconnection Agreement, a question of state contract law, and thus is subject to the arbitrary and capricious standard of review.

The Third Circuit has held that a state commission's legal determinations – including whether the interconnection agreement complies with the Telecommunications Act and any applicable federal regulations – is subject to de novo review. MCI Telecomm. Corp. v. Bell Atl. Penn., 271 F.3d 491, 516-17 (3d Cir. 2001). However, factual findings made by the state

commission are reviewed under a substantial evidence standard.[4]  Id. at 517.  Courts have also applied a deferential standard – specifically, the arbitrary and capricious standard – when reviewing a state commission's use of state law to interpret an interconnection agreement.  See, e.g., Sw. Bell Tel. Co., 208 F.3d at 482 (applying arbitrary and capricious standard when reviewing state commission's interpretation of interconnection agreement); S. New England Tel. Co. v. Conn. Dept. Of Public Utility Co., 285 F. Supp. 2d 252, 258 (D. Conn. 2003) (same).  "The arbitrary and capricious standard requires an agency to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  S. New England Tel. Co., 285 F. Supp. 2d at 258 (citing MCI Telecomms. Corp. v. New York Tel. Co., 134 F. Supp. 2d 490, 500-01 (N.D.N.Y. 2001)).

This Court will apply the de novo standard of review when determining whether the BPU decision conforms with federal law, specifically the ISP Remand Order.  The BPU's interpretation of the Interconnection Agreement will be reviewed under the arbitrary and capricious standard.  See Mich. Bell Tel. Co. v. MFS Intelenet of Mich., Inc., 339 F.3d 428, 433 (6th Cir. 2003); Sw. Bell Tel. Co., 208 F.3d at 482; S. New England Tel. Co., 285 F. Supp. 2d at 258.

**B.     Invocation of the Change-In-Law Provision**

None of the parties dispute that the ISP Remand Order triggered the change-in-law

---

[4] Other courts have applied the arbitrary and capricious standard of review when reviewing factual determinations made by a state utilities commission.  In this context, however, courts have noted that "there is no meaningful difference between [the arbitrary and capricious] standard and the substantial evidence standard we apply."  See, e.g., Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tex., 208 F.3d 475, 482 n.8 (5th Cir. 2000) (citing GTE S., Inc. v. Morrison, 199 F.3d 733, 745 n.5 (4th Cir. 1999)).

provision in the Interconnection Agreement. The ISP Remand Order establishes a rate structure for ISP-bound traffic which conflicts with the Interconnection Agreement's rate structure for local telephone calls as applied to ISP-bound traffic. Thus, the only outstanding issue is the date on which the lower rates listed in the ISP Remand Order become effective under the Interconnection Agreement.

### C. The Effective Date of the Rate Structure in the ISP Remand Order

#### 1. The BPU's Interpretation of the Interconnection Agreement Was Not Arbitrary and Capricious

In its decision, the BPU stated that the ISP Remand Order rate caps applied to the parties' Interconnection Agreement effective July 21, 2002 because the Settlement Agreement covered rates due for ISP-bound traffic for the period ending July 21, 2002. After applying the arbitrary and capricious standard, this Court holds that the BPU's decision should be upheld.

The fundamental principles of contract interpretation are well-settled in New Jersey. When interpreting contracts, courts examine the plain language of the agreement to discern the common intention of the parties. Highland Lakes Country Club & Cmty. Ass'n v. Franzino, 892 A.2d 646, 656 (N.J. 2006). "The court will, if possible, give effect to all parts of the instrument, and an interpretation which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable." Md. Cas. Co. v. Hansen-Jensen, Inc., 83 A.2d 1, 4 (N.J. Super. Ct. App. Div. 1951). "It is not the judicial interpretive province to give effect to some supposed unexpressed intention of the parties." Krosnowski v. Krosnowski, 126 A.2d 182, 187 (N.J. 1956).

The BPU's selection of July 21, 2002 as the effective date is consistent with the language

10

of the Interconnection Agreement, which does not expressly require prospective enforcement of its decision. The change-in-law provision sets forth a step-by-step process that United must follow in order to secure an amendment to the Interconnection Agreement that complies with the change in the law. Although the change-in-law provision does not expressly require the ISP Remand Order rates to be implemented retroactively, the change-in-law provision also does not expressly require the current terms of the Interconnection Agreement to continue in effect while its process is completed.[5] If the parties had intended the current terms of the Interconnection Agreement to govern, they would have included such language in the agreement.

The parties' intentions are further highlighted by language in Section V(B) of the Interconnection Agreement, the termination provision, which states:

> In the event of such termination [of the Interconnection Agreement], this Agreement shall continue without interruption until a) a new interconnection agreement becomes effective between the Parties, or b) the Commission determines that interconnection shall be by tariff rather than contract and both Sprint and MCIm have in place effective interconnection tariffs.

(February 2005 Joint Stipulation of Facts Ex. JS-1 at 14.) That the parties expressly provided for the continuation of the Interconnection Agreement in the termination provision implies that the parties did not intend the current terms of the Interconnection Agreement to continue in effect

---

[5] MCI relies on Verizon Calif., Inc. v. Peevey, 462 F.3d 1142 (9th Cir. 2006) for the proposition that the ISP Remand Order rate caps do not apply during the renegotiation process. 462 F.3d at 1152-53. MCI's reliance on the Peevey decision is flawed for two reasons. First, the state commission in Peevey held that the ISP Remand Order did not trigger the interconnection agreement's change-in-law provision; in the instant case, none of the parties dispute that the ISP Remand Order triggered the change-in-law provision. Second, the plaintiff in Peevey terminated the interconnection agreement pursuant to Paragraph 9.02 of the interconnection agreement, which solidifies the continuation of the current terms of the interconnection agreement during the renegotiation process. Here, MCI did not terminate the Interconnection Agreement, an act that unequivocally would have mandated continuation of the current terms of the Interconnection Agreement under Section V(B) therein.

when the change-in-law provision is invoked.

The BPU's decision to apply the ISP Remand Order rates to the Interconnection Agreement effective July 21, 2002 is supported by the language of the Interconnection Agreement. Irrespective of whether the BPU could have interpreted the Interconnection Agreement differently, the BPU's decision is supported by evidence contained in the record, is not arbitrary and capricious, and accordingly will be affirmed.[6]

2. The BPU Decision Conforms With Federal Law

MCI argues that the BPU's decision is preempted by federal law. Specifically, MCI contends that the BPU decision, which was rendered on December 5, 2005, violated the ISP Remand Order because it established July 21, 2002 as the effective date of the change in the compensation rate. However, the July 21, 2002 effective date does not conflict with the ISP Remand Order because the ISP Remand Order does not require implementation of its rate structure on a prospective basis when an interconnection agreement's change-in-law provision is invoked.[7] The ISP Remand Order states that it applies to expiring interconnection agreements

---

[6] This Court is not persuaded that MCI's bankruptcy filing plays any role in determining the date on which the ISP Remand Order rate caps become effective under the Interconnection Agreement.

[7] In addition, because the Interconnection Agreement was voluntarily entered into by MCI and United, the parties are not required by law to conform to the reciprocal compensation requirements set forth in the Telecommunications Act and related federal regulations. Under the Act, there are two ways in which carriers may enter into an interconnection agreement. One method involves a compulsory arbitration process: if an ILEC receives a request from a CLEC to negotiate an interconnection agreement, but the carriers ultimately fail to reach an agreement, either carrier may petition a state utilities commission to arbitrate any open issue. 47 U.S.C. § 252(b)(1). Under the second method, the ILEC voluntarily enters into an interconnection agreement with the CLEC. 47 U.S.C. § 252(a)(1). Use of the latter method exempts the carriers from complying with subsections 251(b) and (c) of the Act. Id. Significantly, it is subsection 251(b)(5) of the Act which requires carriers to establish reciprocal compensation arrangements

*unless* an agreement includes a change-in-law provision and a party to the agreement invokes that provision. 16 F.C.C.R. at 9189.  This statement creates an exception permitting carriers to amend the rate structure in an interconnection agreement that is not expiring pursuant to the agreement's change-in-law provision.  The ISP Remand Order is silent as to when its rate structure becomes effective if the change-in-law provision is invoked.  Because the ISP Remand Order does not expressly require the Interconnection Agreement to continue in effect pending a carrier's completion of the steps set forth in the change-in-law provision, it does not preempt the BPU's decision.

### 3. The BPU's Decision Does Not Amount To Retroactive Ratemaking

MCI also argues that the BPU's decision should be vacated because its designation of July 21, 2002 as the effective date amounts to a retroactive application of the ISP Remand Order. This argument is rejected for two reasons.  First, the BPU did not implement the ISP Remand Order retroactively because it was not imposed on rates collected or due prior to the ISP Remand Order's effective date,  July 14, 2001.  Ratemaking is a legislative function, and thus by its nature

---

for the termination of telecommunications, and from which the ISP Remand Order exempts ISP-bound traffic.  Because the parties are not bound to adhere to subsection 251(b)(5) of the Act, they are not required by federal law to adhere to the terms of the ISP Remand Order.  Rather, it is the change-in-law provision in the Interconnection Agreement, if invoked, which requires the terms of the ISP Remand Order to be implemented into the reciprocal compensation scheme.  The BPU's decision does not rest upon the parties' compliance with the requirements of the Telecommunications Act or the ISP Remand Order but instead interprets the meaning of the change-in-law provision in the Interconnection Agreement.  See Verizon Calif., Inc. v. Peevey, 462 F.3d 1142, 1151 (9th Cir. 2006); Verizon Md. Inc. v. RCN Telecom Svcs., Inc., 248 F. Supp. 2d 468, 485 (D. Md. 2003).  Stated differently, the rates in the ISP Remand Order are applied to the Interconnection Agreement because the change-in-law provision mandates such a change, not because the ISP Remand Order mandates such a change.

13

operates prospectively and not retroactively. Petition of Elizabethtown Water Co., 527 A.2d 354, 360 (N.J. 1987). The ISP Remand Order specifically states that its rate caps may apply, at the earliest, "beginning on the effective date of this Order . . . ." 16 F.C.C.R. at 9187. Thus, although the BPU cannot impose the rate caps prior to July 14, 2001, it is not barred by the ISP Remand Order from implementing the rate caps for charges incurred after July 14, 2001. Second, as discussed supra in Section III, C, 2 of this Opinion, the ISP Remand Order does not dictate the effective date of the changed rate structure. The ISP Remand Order alters compensation rates charged by carriers after July 14, 2001 "*to the extent* that parties are entitled to invoke contractual change-in-law provisions." 16 F.C.C.R. at 9189 (emphasis added). Thus, the change-in-law provision, and not the ISP Remand Order, dictates the effective date for the new rates announced in the ISP Remand Order.

MCI also alleges, unsuccessfully, that the BPU decision constitutes retroactive ratemaking in violation of New Jersey state law. The BPU's decision does not amount to retroactive ratemaking because the rates charged from December 7, 2001 to the present could no longer be considered "established" once United invoked the change-in-law provision. New Jersey state law empowers the BPU to "fix just and reasonable individual rates . . . which shall be imposed, observed and followed thereafter by any public utility, whenever the board shall determine any existing rate . . . to be unjust, unreasonable, insufficient or unjustly discriminatory or preferential." N.J. STAT. ANN. § 48:2-21(b)(1). Retroactive ratemaking, prohibited under the aforementioned statute, occurs when the BPU permits a utility to recover for its past losses or requires a utility to refund excess profits collected under then lawfully established rates. Elizabethtown Water Co. v. N.J. Bd. of Pub. Util., 527 A.2d 354, 357-58 (N.J. 1987).

MCI argues that the BPU decision constitutes retroactive ratemaking because it requires MCI to refund to United the difference between the rates paid for ISP-bound traffic under the Interconnection Agreement since July 21, 2002 and the rates due according to the ISP Remand Order's compensation scheme for all ISP-bound traffic since July 21, 2002.  However, the rate structure set forth in the Interconnection Agreement was called into question on December 7, 2001, when United invoked the change-in-law provision in the Interconnection Agreement.  The ISP Remand Order states that its rates may be implemented in an interconnection agreement to the extent that a party invokes a change-in-law provision.  Once United invoked the change-in-law provision, all compensation rates from that date forward became in dispute, to be resolved in accordance with the terms of the change-in-law provision.  See 17A AM. JUR. 2D Contracts § 372 (2004) (stating that changes in the law subsequent to the execution of a contract are not binding unless the language of the contract clearly indicates that the parties intended otherwise).  The negotiated agreement resolved the rate structure from December 7, 2001 to July 21, 2002, thereby leaving the BPU to decide the rate structure from July 21, 2002 to the present.  The BPU is not prohibited by law from deciding the very issue it was asked to resolve.

## IV.  CONCLUSION

For the reasons stated above, this Court finds that, while the record does not raise any "genuine issue as to any material fact," Plaintiff has not shown "that [it] is entitled to a judgment as a matter of law."[8]  FED. R. CIV. P. 56(c).  Defendants' motion for summary judgment is denied.

Dated: October 19, 2007

    S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.

---

[8] Neither Defendant BPU nor Intervenor-Defendant United filed cross-motions for summary judgment.

16